I'm here on behalf of Eugene and Aubrey Gavignan. This is a case involving what amounted to a home invasion by law enforcement officers in a quiet retirement community just south of Tucson, based almost solely upon what was in essence an anonymous tip telephone call made by a cell phone caller. Pardon me, counsel. Yes, sir. She identified herself as Jennifer, and she identified herself as a operator for the Tucson Police Department, and she gave her cell phone number, correct? No, actually, she did not identify herself as an operator for the Tucson Police Department. That was a fact later found out. She identified herself as Jennifer, and she identified the cell phone from which she was calling after being prompted a few times by the operator. But, counsel, the fact that she was later identified, doesn't that belie an argument that she was an anonymous tipster? Those facts were not known by the officers at the time. What we have to look at is what the officers knew at the time they broke down the doors and went into this home. The transcript says, I work for the TPD. Yes, sir. She does not say that she was a telephone operator or anything of that sort. She says, well, I work for the TPD, and she gave her cell phone number. She said Jennifer. Yes, that's correct. She didn't have to be prompted to give that. I think you're exaggerating. Please stick to the facts. Yes. This is not a jury argument, right? Yes, I understand that, sir. In essence, what we have is a dispatch shortly thereafter. These officers were dispatched not knowing the facts contained within this telephone call whatsoever. All they knew was that they were being dispatched. It doesn't matter, though. It doesn't matter. It's the collective knowledge of everyone involved in the call that's pertinent. Wouldn't you agree? I would agree to some extent. But the fact is, is that the officers, when they arrived at the home, knocking on all of the doors and windows and receiving no response, at that point in time, they checked with communications to find out what indeed were the facts that justified the call, and they're being dispatched. Does it matter that this was a perceived domestic violence call? I don't think that it does matter. I think when the officers are dispatched for whatever reason, they have to have some reason to enter the home, and upon which to base a forcible entry into a home without a search warrant and without any other facts. Didn't the police officers say that they're a little more cautious on domestic violence calls, and they treat those calls differently, because often those are the most violent calls they respond to? Yes, Your Honor. That's what the officers said, and that's what some case law says, that it is a particularly volatile situation, perhaps. But nevertheless, what these officers knew was what they verified from communications, that there had been some yelling and door slamming. And those were the essential facts that Officer Dubrava or Sergeant Dubrava knew when he authorized the entry into the home. Was it disputed as to how close she was to the, I guess, is it Gavinon? Gavigan. Gavigan. I think there's an improper N in there. There's an extra N in there. Yes. Gavigan. Gavigan. All right. What does it make any difference how close? Was she next door, a few blocks down, a few houses down? Was there any dispute as to that? I don't believe that was disputed. I think that the truth of that was that it was the house in back of them, but two or three houses over. If memory serves me correctly, it was three houses over. All right. I thought it was directly behind. No, it was not. What difference does it make? She gave the license number of the car in front of the house, which is not. Apparently, the testimony was that she walked around the block and then looked to see the front of the house, and there was a very old automobile there, kind of a classic car, and she identified the plate on that car that was in the driveway. And that's how she identified the house from which she heard this.  I'm going to ask you a question about the transcript of the testimony, which is that the house is directly behind hers. No, if there's something in the record that says that, it's incorrect, because at the depositions, we had maps of the house. That is what the transcript says of what the police officers knew from the person who was calling. She gives the address at which the disturbance took place, and she says, we were standing out front of her house, and his house is directly behind hers. And the first thing we heard him screaming and cussing, and then he slammed the door. Right. I believe that that's not, in fact, the truth. But if we're talking about what the officers were operating on, which was your frame of reference that you conveyed to us, then the information the officers had was that the house was directly behind. I'm not positive that's the information that they had, but I won't disagree that that one part of the record might say that, but that the maps, which are not part of the record on appeal, indicated that it was a few houses over and in back. But nevertheless, knowing only these facts, they've called to verify, why are we here? What are the real facts? What should we do? And Sergeant Dubrava then discovered, from the communications people, all just door slamming and yelling. Wasn't there a report that there was a hitting noise, like a person or a table being hit? That was contained within the 911 transcript, but that was not told to the officers who made the decision to enter the home. How many officers were there? There were four officers. All right. Didn't one testify that he thought he saw someone going from the door from the front of the garage and that he thought he believed he saw somebody in the garage going in or out of it, but that was later disputed by, of course, the Gavigans who were in bed asleep at the time. So that is a disputed question. That was a disputed question. Which goes to your question about summary judgment. Yes, it does. And based on the scant facts that we have here, we'd like to compare it to what happened in the case of Gavigans v. Sierra Vista, which was a case arising in the same jurisdiction, in fact, the same district court judge. In that case, they received an anonymous call saying that a woman was getting the S beat out of her for hours on end. And the officers arrived, found shouting, heard shouting, heard a commotion, heard a card table moving, heard chairs moving. Pardon me. Yes, sir. Let me read the opinion. They said they heard it was anonymous and there was the sounds of a card game. Mr. Hopkins opened the door. Yes, sir. That didn't happen here. Also, there was no prior telephone call which went unanswered. Right? That certainly is true in the Hopkins case. So there's a few differences in the facts. There are many differences in the case, but not only did they know those facts, but in Hopkins they knew he had a history of prior domestic violence with his wife. They knew that the officer smelled alcohol, saw signs and symptoms of alcohol consumption by Mr. Hopkins. And, nevertheless, all of those facts did not rise to the level of summary judgment. This Court reversed the District Court of Arizona and, in essence, said this was a matter for the jury. And that's what we're going to do. Counsel, it's very easy for us to look back and parse these facts in the cold light of day. But when the officers respond, how are we, I mean, what are the officers supposed to do if they get a possible domestic violence call? What would you suggest that the officers should have done in view of the fact that they attempted to knock on the door, no response. They attempted to call on the phone, no response. What should the officers have done at that point? There are two possibilities. Having been an officer myself, I'd say that one thing they can do is get a telephonic search warrant. I think that was admitted in the by Sergeant Dubrava. He had a great deal of familiarity with telephone search warrants. But does the law require that? Pardon me? Do you think the law requires that? I don't think the law requires that in every case. I think that had the facts been more egregious here, they could have entered this home. I think given the scant facts we had here, they probably should have gone to a judge for a telephonic warrant, which would take 15 minutes or possibly even less. The second option would be to spend a little more time outside the house and continue beating on the doors and the windows. It appears from the record that the entire transaction lasted 40, I think 48 minutes in the estimation of one of the officers and from the times he wrote down in his report. But of that 48 minutes, only about 10 to 15 of it appears to have occurred outside the home. The rest of it was all while they were inside the home with the gavagans questioning  How long do you think the officers should have stayed outside the home? I think they should have spent a good 30 minutes outside that home and waited to see if they could arouse the gavagans. You must understand, this is a very quiet retirement community. We're not talking about a place where there is typically any kind of criminal activity. This is a very quiet community south of Tucson, which was structured and built as an entire retirement community with many different sub-communities within it. I think that there was a rush to come in and a rush to break down the door of these people's home and hold them at gunpoint for what amounts to about 30 minutes. Counsel, you've used most of your time, so we'll give you a minute on rebuttal. Okay, thank you. We'll hear from the county. Good morning. May it please the court, Nancy Davis for the Pima County Defendants Appellees. The district court's decision to grant summary judgment in favor of Pima County was appropriate for three reasons. First, there really is no dispute about the material facts which would preclude the grant of summary judgment as a matter of law. Second, there was no constitutional violation by the sheriff's deputies when they made the warrantless entry into the gavagan household. And third, even if there was a constitutional violation, the sheriff's deputies are entitled to qualified immunity for the failing, for there to be a failure of showing that the officers have violated any clearly established law. Counsel, how do you distinguish the Hopkins case? I think that that case is very distinguishable, Your Honor. In Hopkins, it was reversed and remanded for a dispute about a material fact as to what the officer actually thought he heard, whether it was sounds of a card game versus sounds of a domestic brawl or violence occurring in the residence in that situation. When the court reversed Hopkins, they noted that they weren't making a finding that these facts were insufficient to support probable cause, just that in this situation, there was a material fact which should be resolved by the jury. I wonder about that. Wasn't there a question here whether she identified herself sufficiently? And wasn't there a question here whether she heard a female voice in the other house as well as a male voice? Wasn't there a disputed issue of fact as to that? There is, but those are not material facts necessary to resolve this case. In this situation, it was called out as a Priority 1-911 domestic violence call. That information was relayed to the police officers. They responded 15 minutes after the call was made, so it was a very fresh incident. By the time they got to the Gavigan residence, there were no sounds. No one could be identified in the residence, despite knocking on the front door, pounding on the windows in both the front and the back of the house. And we knew those facts, but is it because it was a domestic relations dispute, because there apparently was no sound, no danger, no immediate threat that the officers knew of, is it the fact that it was a domestic relations dispute and something she might have been lying dead on the floor and no one was answering? Well, what makes this different? I certainly think that that's relevant. When the officers got there, shortly after having the call of activity and loud cussing and yelling coming in the residence, they were unable to see anyone. They were unable to make contact, despite banging on the doors, having communications call into the residence to see if someone could get on the phone. And in the officers' opinions, we had officers, one, Sergeant Jabrava, who had been in the residence, who had responded to over 100 domestic violence calls in his career, was concerned that someone could be in there, be dead or injured, and therefore called Jabrava. But anything from this house? I mean, I live in a quiet neighborhood, and if officers came in with guns blaring into my house, I would not consider it kindly. And I'm trying to figure out what let them do that in this case, when there was no answer to the phone, everything was quiet, no sounds from the house. And I'm asking, is it because this was a domestic violence report? What distinguishes this case from allowing a police to walk into anybody's house? I do believe it is because, in part, it was a domestic violence report. And even though they couldn't get contact with anyone, there was every indication that someone should be home. Indeed, the Gavigans themselves admitted that they left the television on because they wanted to create the impression to the rest of the world that somebody was inside and out. But the officers didn't know that that's why the television was on. The officers did see a flickering television. Yes, but they didn't know why. No, but that is a sign. Lots of people leave televisions on all day and all night. That is true, but it's objectively reasonable for an officer responding to a 911 call of domestic violence to assume that if the television is on, that if a car is in the driveway, another car is in the carport, that somebody should respond to the banging on the front door, the identifying of sheriff's deputies open up, and also to the phone call. And here, they took numerous steps to try to make contact before making the entry and were unable to do so, and only did so because of fear that someone may be injured or dead inside the residence. This case is also very relevant in context of a recent decision from this Court last year in Martin V. City of Oceanside. There, the Court upheld a warrantless entry in response to a welfare check to the residence of a Tracy Martin in that case. In that case, the father had called into the police department, concerned because he was unable to make contact with his daughter. The officers there responded to the residence. Two cars were in the driveway. They spoke to a neighbor. The neighbor said somebody should be home, and the officers then decided to make the entry into the house once they were unable to make contact. That's also very similar to the situation in Murdoch v. Scout, where the Fontana Police Department was responding to a 911 call of suspicious activity. They showed up to the house. The house was dark. They walked around. They tried to make contact. They noticed that a back door was open. They heard a television and went in, and the gentleman in that case was actually sound asleep or taking a nap in his bedroom. Counsel, weren't there State law claims? There were, Your Honor. And what happened with those? The results were dismissed as well? Those claims were dismissed once the Federal claims were taken care of. Those claims were also dismissed. Why? Because the officers' actions were justified. Therefore, the negligence claim, the intentional infliction of emotional distress, if there was no constitutional violation and those claims were justified, then those claims were properly dismissed. The standard of proof for a negligence claim is different than for a 1983 claim. It is. There are different standards in those two claims. A lesser standard for negligence. But you still look to the reasonableness of the officers' actions and whether what the duty was and whether there was a breach of that duty. And in this case, there wasn't a breach of that duty. The problem is that the court didn't go through any of that analysis in terms of the State law claims. So I don't know why the court dismissed the State law claims. It didn't equate the Arizona standard of care for negligence, intentional infliction of emotional distress, or any of those causes of action, and compare it to the standard of proof for a 1983 cause of action. That is correct, Your Honor. But I don't know that the court was required to do it once it resolved the Federal Court claims. And clearly, I think the undisputed facts show that those claims were subject to dismissal. Excuse me. Excuse me? The State claims were dismissed with prejudice. I believe so. That's correct. And you do see a difference between the qualified immunity created by Sosier v. Katz and the State claims when there's no qualified immunity. There – that's true, Your Honor, except there is immunity under Arizona State law for State law claims. Is there any citation to any such immunity in any of the court's decision? I don't believe that there is, but I know that in the appellate briefs that were submitted, the county did refer to State of Arizona v. Green, and I believe State of Arizona v. Tassler when it talked about probable cause and the entry into a residence without a warrant. But we mean in the district court. In the district court? Was that in your briefs? It was. I believe it was cited. I'd have to check to see if it was actually cited in the motion for summary judgment. I know it was cited in the appeals briefs before this Court. In any event, we have no analysis by the district court judge of those cases, do we? No, Your Honor. All right. Thank you. I think what is important in this situation is to realize that the officers' action was very reasonable given the circumstances. There's been no showing that they violated a clearly established right. And in fact, the law at that time showed that a 911 call for domestic violence plus attendant circumstances that the officers were aware of do justify a warrantless entry into the residence. And here, there was simply more than just the yelling and a slamming of a door. There was also the information related to what they observed on scene. They verified the license plate of the historic car located in the front driveway. That was verified with communications. They also verified, had them call in and try to contact the residents in that manner, and there was additional steps to try to raise the residents by knocking and banging on the front door. And even though not mentioned in the appellate briefs, but certainly supported by the exhibits that were attached to both parties' separate statement of facts at summary judgment, the officers also had tried to ring the doorbell. We think the fact that one officer saw or thought he heard footsteps in a garage and a door closing is not a relevant or the only fact that needs to be looked at in determining whether there was probable cause in exigent circumstances for the warrantless entry in this situation. If there are no further questions, I'll rest my case. All right. Thank you, counsel. Rebuttal. Briefly, the only thing I would like to stress is on the State court claims, all of those State cases were cited for the proposition of what constitutes trespass or assault or domestic violence. I don't think any of those were cited for the qualified immunity statutes under the State of Arizona law. So I think that sort of addresses the issue that you brought up earlier on the State claims. All right. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court.
judges: D.W. Nelson, Rawlinson, Bea